UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| V. | ) | No. 2:08-CR-28 |
| | ) | |
| BRANDON L. DAMPIER and | ) | |
| ISAAC C. KING | ) | |

## <u>REPORT AND RECOMMENDATION</u>

On August 19, 2006, Officer Kenni Carter of the Greeneville Police Department stopped a vehicle driven by the defendant King, and in which the defendant Dampier was a passenger. A subsequent search of that car revealed a quantity of marijuana, paraphernalia, firearms, and ammunition. As a result, defendants have been indicted in this court for being convicted felons in possession of a firearm, for possession of marijuana with the intent to distribute it, and for possessing and carrying a firearm in relation to a drug trafficking offense. Both defendants have filed motions to suppress all evidence seized during the traffic stop, and all statements made by them during or after that stop. (Docs. 25; 33; 68).

In Dampier's motion to suppress (Doc. 25), and his supplemental motion to suppress (Doc. 68), he alleges that all evidence resulting from the traffic stop should be suppressed for the following reasons: that the police officer continued his investigation long after the reason for the traffic had been completed, and that he had no reasonable and articulable suspicion to persist in an investigation beyond the time needed to consummate the traffic stop; and that the drug-detecting dog ultimately utilized by the police officer was not reliable

and in any event the dog was utilized after the initial purpose of the traffic stop had been completed.

In his motion to suppress (Doc. 33), the defendant King contends that he was stopped by the police officer "solely due to his race in violation of the Equal Protection Clause. . . ." (Doc. 33). However, in his supporting brief, Mr. King says nothing about his race, but rather asserts the officer detained him after the purpose of the traffic stop had been completed.

Pursuant to the standing order of this Court and 28 U.S.C. § 636, these motions have been referred to the magistrate judge for reports and recommendations. An evidentiary hearing was held on November 4, 2008. Because all three motions to suppress involve the same facts, they will be addressed in this single report and recommendation.

The only witness who testified was Officer Carter. He was a credible witness and his testimony was believed. From Officer Carter's testimony the court finds as follows:

Officer Carter has been a police officer with the Greeneville Police Department for nine years; he is Greenville's K-9 officer, and was so on August 19, 2006. On that date, Officer Carter's K-9 partner was "Rhico." Officer Carter and Rhico were on patrol that night. At approximately 11:30 p.m., Officer Carter was preparing to pull from the BP service station parking lot onto US Highway 11-E in Greeneville. As he was doing so, he looked to his left, or east.[1] Only a short distance to the "east" was a used car lot business, Ken's Motors. Of course, at this late hour, the business was closed. As Officer Carter

---

[1]Technically, US Highway 11-E runs north and south; however, it is extremely common in this area to refer to 11-E as running east and west. Suffice it to say, Officer Carter was looking to his left in the direction of Johnson City.

looked in that direction, he saw a vehicle turn on its headlights in the car lot, and drive onto US Highway 11-E, turning to the west, or toward Officer Carter. Simultaneously, another car in the lot also turned on its headlights, and it followed the first car onto Highway 11-E. Both cars traveled to a median cut-through and executed a U-turn, driving back to the "east." Because the two cars had been parked side-by-side on Ken's Motors' parking lot at approximately 11:40 p.m. and then drove off at the same time, Officer Carter decided to follow them. The first car turned off US Highway 11-E onto a side street, Industrial Boulevard. The second car continued on Highway 11-E.

Officer Carter followed the second car, i.e., the one which remained on US Highway 11-E. When he drew close to this car, he noticed that its license tag was bent upward at a ninety degree angle. It was creased or bent at the top, so that the vast majority of the tag stuck straight out and was therefore illegible. Because of the circumstances of this car parked with another on a closed car lot at nearly midnight and the illegible car tag, Officer Carter activated his blue lights. The vehicle pulled into the Days Inn Motel parking lot. The traffic stop occurred no more than one-fourth mile from the time that Officer Carter began following it, and it began at 11:39 p.m. The entire traffic stop was recorded on the patrol car's video camera.

After the traffic stop, Officer Carter saw that the license tag was a temporary tag. It no longer jutted straight out at a ninety degree angle, but it still angled at approximately forty-five degrees. Officer Carter presumed, and reasonably so, that it jutted out at ninety degrees when the car was moving due to wind pressure.

Officer Carter approached the driver (now known to be Mr. King) and asked for his drivers license and proof of registration. King provided an Ohio drivers license. The registration revealed that neither Mr. King nor his passenger (Mr. Dampier) was the owner of that car. Officer Carter also asked the passenger Dampier for identification, and Dampier said that he had none, although he did furnish his name and date of birth when asked to do so by Officer Carter.

In the course of asking for identification and registration documents, Officer Carter mentioned that he had seen the defendants' vehicle leave the used car lot with another car. Officer Carter asked them about their presence, and the presence of the other car, on the used car lot; the defendants denied that there was another car. Since Officer Carter had seen this other car leave immediately before the defendants' car, Officer Carter knew their statement that there was no other car was an outright lie.

The defendants explained their presence on the parking lot by telling Officer Carter that they were looking at trucks. One of the defendants said the truck they were looking at was brown, the other said the truck was red.

Officer Carter took the vehicle registration document and King's drivers license back to his patrol car. He radioed in that information, along with the verbal information supplied by Dampier, to his dispatcher. At 11:49 p.m., Officer Carter received information from his dispatcher that the vehicle was not stolen and that the Ohio drivers license of Mr. King was legitimate. Officer Carter then walked back to the defendants' car, and engaged them in a conversation regarding their temporary tag. Specifically, he told them that they should

4

either display it in the rear window so that it could be read or, alternatively, they should tape in down so that it did not "flap in the breeze," so to speak.

It bears noting at this point that the Greeneville Police Department already had experience with individuals known as the "Ohio Boys," a group of black males from the Akron, Ohio area who were dealing drugs in the Greeneville, Tennessee area. Only a few days earlier, a shooting had occurred in Greeneville involving a member of the Ohio Boys. Each of these defendants acknowledged that they were from Ohio, and they were black. Mr. Kings' drivers license indicated that he was from Akron, Ohio. This information, coupled with the highly suspicious circumstances of their presence on the car lot at nearly midnight, and their outrageous denial that there was another car on the used car lot, caused Officer Carter to suspect that the defendants were transporting illegal drugs.

At that same time, i.e., 11:49 p.m., Officer Carter asked them if they had any guns or drugs in the car, which the defendants denied. At 11:50 p.m., Officer Carter asked the defendants if he could search their car. They refused. Officer Carter renewed his request to search the car, and King again refused, but he did say something to the effect, "Walk your dog around the car if you want to."[2] At 11:51 p.m., Officer Carter told them that he was going to have his dog walk around the car. By this time, two other officers had arrived.[3]

---

[2] The audio recording is sufficiently clear that this statement can be heard.

[3] Officer Carter never called for back-up assistance, because he knew that other officers, when they heard his conversation with the dispatcher regarding a drivers license from Ohio, would automatically respond to his location. Indeed they did.

At 11:53 p.m., Officer Carter walked Rhico around another car in the parking lot that he had picked out at random. He testified that he routinely does this to avoid a suggestion to the dog that the target car contains drugs. The dog did not alert on this car. He then took the dog to the defendants' car, and within a matter of a few seconds, the dog alerted on the driver's side of the car. Precisely fifteen minutes had elapsed from the traffic stop until the positive alert by the drug dog.

Based upon the dog's alert, the officers searched the car, ultimately discovering a sizable quantity of marijuana, two firearms, digital scales, and ammunition.

At 11:59 p.m., Mr. King is overheard on the recording to complain that Officer Carter did not have a valid reason for the traffic stop; at that same time, both men were placed under arrest and both were searched. Two bags of marijuana were found in Mr. Dampier's pants pocket.

Mr. King almost immediately began negotiating with Officer Carter, offering to "give up" other people in return for being released. Officer Carter did not flatly reject King's offer, but merely stated that such an arrangement would have to be made at another time, not in the middle of the night. King's statement was voluntary, and not made in response to any interrogation. Officer Carter ultimately *Mirandized* both defendants, and all statements made by either defendant thereafter were made with full knowledge of their right to remain silent.

Interestingly, after the defendants' arrest, Mr. King and Officer Carter are overheard to be arguing regarding Officer Carter's probable cause to stop the vehicle. Officer Carter painstakingly told Mr. King the reasons he had to make the traffic stop and conduct the

subsequent investigation - their presence on the parking lot at midnight, with their lights off; the presence of the other car (with lights off also); the defendants' denial that there was another car; and of course the bent tag. Not surprisingly, Mr. King insisted that none of this supported Officer Carter's stop of their vehicle and the subsequent investigation. King's discussion with Officer Carter had an unintended consequence - it supplies undeniable corroboration regarding Officer Carter's suspicions and the reasons therefor.

Officer Carter's suspicions were legitimately aroused when he saw two cars parked side-by-side on a used car lot at midnight when that business was closed. Indeed, a police officer would be derelict in his duty if he failed to at least confirm that nothing amiss was occurring on that property. The lack of "no trespassing" signs on the car lot is of no significance; the fact remains that this was a private business, the business was closed, the hour was extremely late, there were two cars parked with their lights off, and they left simultaneously. It was a suspicious circumstance that should have been investigated.

Tenn. Code Ann. § 55-4-110(b) requires that a vehicle's license tag shall be so placed on the vehicle that it is "clearly legible." The Ohio temporary tag on the defendants' vehicle was made of cardboard, and it was attached to the car with the usual bolts. Because it was made of cardboard, and not affixed at the bottom, it was easily bent. When Officer Carter was following the defendants' car down the roadway, this temporary tag was horizontal to the ground, probably due to the force of the moving air, and it was completely illegible. For this reason alone, Officer Carter had a legitimate reason to effect a traffic stop.

At 11:30 p.m., when the traffic stop commenced, Officer Carter knew that these

7

defendants had been parked on private business property with another car, shortly before midnight. Notwithstanding that Officer Carter saw the other car leave immediately before the defendants' car, the defendants insisted that there was no other car. As already noted, Officer Carter knew this to be a lie.

The vehicle was not registered to either King or Dampier. Officer Carter testified that it is a common tactic of drug dealers to drive cars registered or titled in someone else's name in an effort to avoid the forfeiture of that vehicle in the event the driver is charged with transporting drugs in it. It is also a common tactic of drug dealers to bend or distort their car tags in an effort to impede identification of the vehicle.

Dampier had no identification of any kind. Officer Carter testified that it is common for wanted criminals seeking to avoid capture to refrain from carrying identification, or deny having identification with them. The defendants disagreed between themselves regarding the color of the truck on the parking lot that they were supposedly looking at. And, although it is not an illegal act, it certainly is unusual for two men from Ohio to be looking at trucks on a used car lot in Greeneville, Tennessee, at midnight.

And, lastly, it must be remembered that the Greeneville Police Department was aware of a group of individuals from Ohio who were dealing drugs in Greeneville, Tennessee and engaging in acts of violence.

*THE STOP AND SUBSEQUENT INVESTIGATION*

A law enforcement officer may stop and briefly detain a person for investigative purposes when that officer has "reasonable suspicion," based on articulable facts, that

criminal activity has occurred, or is about to occur. *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *United States v. Williams*, 962 F.2d 1218 (6th Cir) *cert*. denied, 506 U.S. 892 (1992). Whether reasonable suspicion exists must be determined in light of the "totality of the circumstances" that existed at the time. *Ohio v. Robinette*, 519 U.S. 33 (1996). All the facts that led up to the traffic stop, and the information learned by Officer Carter during the course of the traffic stop reasonably caused him to suspect that these defendants were drug dealers. Thus, some brief detention beyond that necessary for the traffic stop was permissible. The first ten minutes of Officer Carter's encounter with these defendants was utilized solely for purposes of the traffic stop. He already had a reasonable suspicion that these defendants had been engaged in criminal activity, and the information he obtained during the stop only heightened that suspicion.

In the eleventh minute of the traffic stop, Mr. King is heard to tell Officer Carter that he may walk his dog about the car, notwithstanding his earlier refusal to consent to a search of the car. In other circumstances, King's statement to Officer Carter that he should walk his dog around the car could be important; but it is of little importance in this case since Officer Carter had more than reasonable suspicion to believe that the defendants possessed drugs, as a result of which he was entitled to walk a drug dog about the car, with or without the defendants' consent. *See, Illinois v. Caballes*, 543 U.S. 405 (2005).

In their cross examination of Officer Carter, defendants attempted to demonstrate that Rhico was not reliable. The court, however, affirms the reliability of the dog. He was trained and certified in August 2006. Officer Carter testified that the dog was used a total

of ninety-one times "on the street." Of those ninety-one times, the dog did not alert eighteen times, meaning that he did alert on seventy-three occasions. On seven of those seventy-three occasions, no contraband was found. Thus, of the positive alerts for drugs, no drugs were found nine percent of the time. Conversely, that means that drugs were found ninety-one percent of the times he alerted.

In defense of Rhico, his apparent false alerts could be attributable to the fact drugs had been present earlier, but removed before he sniffed. Regardless, the Sixth Circuit Court of Appeals has held that a dog's reliability of between ninety and ninety-seven percent is sufficient to establish the drug dog's training and liability. *See, United States v. Navarro-Camacho*, 186 F.3d 701, 706 (6th Cir. 1999). In any event, if a drug-detecting dog is certified, any other evidence that detracts from the dog's reliability goes only to the "credibility" of the dog. *See, United States v. Diaz*, 25 F.3d 392, 394 (6th Cir. 1994). The court finds that Rhico was "credible" and reliable.

The alert of a trained and duly-certified drug-detection dog constitutes probable cause to believe that drugs are present. *United States v. Place*, 462 U.S. 696, 707 (1983). When an officer has probable cause to believe that a vehicle contains contraband, he may search the entire vehicle and any contents located within it. *United States v. Mans*, 999 F.2d 966, 969 (6th Cir.) *cert*. denied, 510 U.S. 999 (1993). That warrantless search may be "as thorough as a magistrate could authorize in a warrant." *United States v. Ross*, 456 U.S. 798 (1982). Since Rhico provided probable cause to believe that drugs were present in the car, Officer Carter and his fellow officers were authorized to conduct a warrantless search of it.

In summation to this point, Officer Carter had reasonable suspicion, based upon articulable facts, that these defendants had been engaged in criminal activity. As a result, a *Terry*-detention was appropriate. That investigative detention included the right to walk the drug dog around the defendants' car. Only fifteen minutes elapsed from the commencement of the traffic stop until the drug dog alerted, well within the limits of reasonableness for a *Terry*-stop under the totality of the circumstances. There is no basis under the Fourth Amendment to suppress the evidence discovered and seized from the defendants' car on August 19, 2006.

## ORAL STATEMENTS

All statements were either spontaneously made by a defendant without any antecedent questioning by the officer, or after the defendants had been properly *Mirandized.* There is no basis to suppress the statements of either defendant.

## CONCLUSION

It is respectfully recommended that the defendants' motions to suppress be denied.[4]


Respectfully submitted,



    s/ Dennis H. Inman
United States Magistrate Judge

---

[4]Any objections to this report and recommendation must be filed within ten (10) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1)(B) and (C). *United States v. Walters*, 638 F.2d 947-950 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).

11